**Debra K. BARTYZEL, Plaintiff–Appellant,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant–Appellee.**

No. 01–4161.

United States Court of Appeals, Sixth Circuit.

Aug. 26, 2003.

---

Timothy F. Cogan, Cassidy, Myers, Cogan, Voegelin & Tennant, Wheeling, WV, for Plaintiff-Appellant.

Randall E. Yontz, U.S. Attorney's Office, Columbus, OH, Kimberly S. Cromer, Assistant Regional Counsel, Office of the General Counsel, Chicago, IL, for Defendant-Appellee.

Before MOORE and CLAY, Circuit Judges, and LAWSON, District Judge.*

## OPINION

LAWSON, District Judge.

The plaintiff, Debra K. Bartyzel, appeals the district court's judgment affirming the decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. The district court found that substantial evidence supported the decision of an administrative law judge that Bartyzel was not disabled because she retained the residual functional capacity to perform a limited range of light work, and that there are hundreds of jobs in the regional and national economies that fit within Bartyzel's exertional and nonexertional limitations. We agree with the reasoning and conclusions of the district court, and therefore affirm the judgment for the Commissioner.

I.

The plaintiff was forty-one years old when she filed her application for a period of disability and disability insurance benefits on January 31, 1997. She had obtained a high school equivalency diploma (a GED). For almost twelve years she had worked as a sales clerk, beginning in June 1983. In June 1989, she injured her back at work, and aggravated this injury six months later. Her pain symptoms worsened, and she eventually stopped working on June 16, 1995.

The plaintiff's claim for benefits, which was based on the plaintiff's back symptoms coupled with the inability to read and understand, was denied initially, and the denial was upheld on reconsideration. The plaintiff then appeared before Administrative Law Judge (ALJ) Paul Bogas in Morgantown, West Virginia on October 1, 1998 when the plaintiff was forty-three years old. ALJ Bogas filed a decision on December 21, 1998 in which he determined that the plaintiff's insured status extended through December 31, 1998, but he denied benefits because he found that the plaintiff was not disabled. The ALJ reached this conclusion by applying the five-step sequential analysis prescribed by the Secretary of Health and Human Services in 20 C.F.R. § 404.1520. The ALJ concluded

---

\* The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

that the plaintiff had not engaged in substantial gainful activity since June 16, 1995 (step one); the plaintiff suffered from several impairments consisting of cervical strain, L5 radiculopathy, dysthymic disorder, reading disorder, somatization disorder, and borderline intellectual functioning that the ALJ determined were "severe" within the meaning of the Social Security Act (step two); none of these impairments by themselves or in combination met or equaled a listing in the regulations (step three); and the plaintiff could not perform her previous work as a sales clerk, which the ALJ found to require medium to heavy exertional effort (step four). In applying the fifth step, the ALJ concluded that the plaintiff's residual functional capacity (RFC) allowed her to perform a range of light work restricted by non-exertional limitations, that is, jobs that gave her the option to sit or stand; required only occasional climbing, balancing, stooping, kneeling, crawling or crouching, but that did not require repetitive bending; did not require complex tasks, but only simple, routine, repetitious work with one or two steps; required few independent decisions and no reading, writing, or making change; and did not demand that she perform at more than a medium rate of production. Relying on the testimony of a vocational expert, the ALJ found that jobs such as locker room attendant, small parts assembler, hand packer, and security monitor fit within those limitations, that the plaintiff was able to make a vocational adjustment, and that these jobs existed in significant numbers in the national and regional economies. The ALJ also used the Secretary's Medical–Vocational Guidelines as a framework to reach his conclusion that the plaintiff was "not disabled." *See* C.F.R. Pt. 404, Subpt. P, App., 2 § 202.20.

The ALJ's decision became the final decision of the Commissioner after the Appeals Council denied the plaintiff's requests for review, and the plaintiff filed a timely action in the district court seeking review of the agency decision. The plaintiff raised several points of error in the agency decision, rejected by the district court, which she repeats here. First, the plaintiff contends that the ALJ's conclusion that she could perform light work was not supported by substantial evidence, pointing to evidence in the administrative record, presumably disregarded or misinterpreted by the ALJ, that tends to contradict that conclusion. She also challenges the ALJ's finding that the plaintiff's description of her pain and functional limitations was not fully credible, contending that the ALJ did not follow the rules for assessing subjective complaints. Next, the plaintiff insists that the ALJ should have found in her favor at step three of the five-step sequential analysis because, she believes, her diagnosis of fibromyalgia proves that she has a listing-level impairment. Finally, the plaintiff contends that her ability to cross-examine the vocational expert (VE) at the administrative hearing was improperly restricted.

The administrative record developed by the Agency indicates that the plaintiff was born on February 1, 1955. She obtained her GED and began working as a sales clerk in 1982. J.A. at 66, 401–02. In June 1989, the plaintiff injured her back attempting to remove a microwave from a box while working at Best Products. J.A. at 194,261. She aggravated this injury on December 27, 1989. J.A. at 261. In 1991, the plaintiff began seeing a counselor, David R. Bousquet, M.Ed., for depression. J.A. at 301–303. On June 11, 1991, she met with Dr. David H. Liebeskind, who diagnosed the plaintiff as having "[c]hronic fibromyalgia affecting the back, thorax and cervical area." J.A. at 306. In July 1992, the plaintiff began seeing chiropractor Craig S. Bentley, D.C., for chiropractic

treatment. J.A. at 282. The plaintiff continued to experience pain and eventually stopped working on June 16, 1995. J.A. at 66.

In 1996, Ms. Bartyzel began treating with Dr. Laura B. Fleck, a back specialist. Dr. Fleck examined her on March 19, 1996, and noted that the plaintiff's general appearance was one of being uncomfortable and avoiding movement. J.A. at 195. Dr. Fleck also noted that the plaintiff's posture was

> abnormal with decreased lumbosacral lordosis and mild cervical kyphosis. Lumbosacral range of motion is diminished in all planes. Her gait is abnormal as she walks favoring her left leg. Muscle examination shows normal strength. She has no atrophy of fasciculations. Her sensation is diminished in the lateral aspect of her thigh and calf with negative Tinel's at the fibular head. Her reflexes are symmetric. On palpation she is tender in the lumbosacral region at L4/5 and L5/S1. She is also exquisitely tender in the left sciatic notch. She had positive straight leg raise on the left which was confirmed with dorsiflexion and in a seated position. Other provocative maneuvers were negative.

J.A. at 195. According to Dr. Fleck, the plaintiff's history and examination were compatible with an active left S1 radiculopathy. J.A. at 195. Dr. Fleck recommended that the plaintiff be "released to perform light-duty [work] according to U.S. Department of Labor guidelines." J.A. at 196. On April 4, 1996, Dr. Fleck noted in a follow-up visit that the plaintiff's "EMG/NCV testing was unremarkable and showed no radiculopathy," and she again released the plaintiff to "light duty" work. J.A. at 249.

The plaintiff also continued treatment with chiropractor Bentley, whom she had seen since July 15, 1992. J.A. at 286. On April 12, 1996, Dr. Bentley sent a letter to the plaintiff's attorney stating that because the plaintiff was previously released to perform "light duty" work and the plaintiff's employer reported that "light duty" work was not possible, the plaintiff "remains temporarily, totally disabled." J.A. at 268. On October 23, 1996, the Allegheny General Hospital Back Institute in Pittsburgh, Pennsylvania, administered a lifting capacity test. J.A. at 203. The results indicated that the plaintiff "demonstrated the ability to perform light work." J.A. at 203. On December 5, 1996, Dr. Fleck sent a letter to the plaintiff's attorney stating that the plaintiff "is capable of gainful employment, though this will likely require vocational intervention." J.A. at 247. On December 17, 1996, Dr. Fleck performed a lumbar myelogram and found that the intervertebral discs at the L4–5 and L5–S1 levels were "bulging." J.A. at 200. However, the test also revealed that no "spinal stenosis or neural foraminal stenosis is present and the facet joints are unremarkable." J.A. at 202.

In December 1996, Dr. Fleck referred the plaintiff to Dr. Adnan Abla for a surgical opinion. J.A. at 243. On January 3, 1997, Dr. Abla examined the plaintiff and stated that he would not recommend "any form of neurosurgical intervention" and that he advised the plaintiff to "continue on a conservative course of treatment to include physical therapy for lower body, low back, and abdominal strengthening exercises." J.A. at 241. Noting this conclusion in her letter to the plaintiff dated February 3, 1997, Dr. Fleck invited the plaintiff to obtain a second surgical opinion, but opined that "the only treatment option ... available is entry into a chronic pain management program." J.A. at 243. Dr. Fleck thereupon terminated her treating relationship with the plaintiff "as I do

not have additional therapeutic options to provide to you." *Ibid.*

In March 1997, the plaintiff underwent a psychological evaluation by David R. Bousquet, the counselor whom the plaintiff had previously seen in 1991, this time on referral from the state disability determination service. J.A. at 205. Mr. Bousquet found that the plaintiff's mood was depressed with underlying features of anxiety and that she presented "with a flat and blunted affect." J.A. at 207. Mr. Bousquet stated that the plaintiff visited her grandmother in a nursing home on a daily basis, did light chores around the house including cooking and the laundry, visited friends, attended church on Sundays, and went out to eat with her husband once a week. J.A. at 209. He administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R) and the plaintiff scored in the borderline range of intellectual functioning, with a full-scale IQ of 76. J.A. at 210. Mr. Bousquet diagnosed the plaintiff with "dysthymic disorder, late onset, reading disorder, [and] somatization disorder." J.A. at 211. Mr. Bousquet also found "[b]orderline intellectual functioning, [f]eatures of dependent personality disorder, [c]hronic lower back pain secondary to work related injury, [and][p]lyschosocial and [e]nvironmental problems: assisting in the care of her grandmother, learning/academic difficulties, functional illiteracy, unemployment, inadequate finances, spouse currently out on strike." J.A. at 211. He assigned a Global Assessment of Functioning (GAF) score of 65, which is indicative of only mild dysfunction. J.A. at 211; *see* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Text Revision 34 (DSM–IV–TR),* 30 (4th ed.2000). Mr. Bousquet concluded that the plaintiff "would be able to relate adaptively and affectively [sic] with co-workers and/or supervisors," would "remember simple/basic instructions and/or directions," and would "be able to maintain attention in order to perform simple repetitive tasks." J.A. at 212. Mr. Bousquet also noted that the plaintiff "would have difficulties dealing with the stress and pressures associated with day to day work activity." J.A. at 212.

In April 1997, JoAnne C. Kadle, Ph.D. a state agency psychologist, reviewed the plaintiff's mental impairment evidence and completed a standard psychiatric review technique form. Dr. Kadle found that the plaintiff suffered from dysthymic disorder (late onset), borderline intellectual functioning, somatization disorder, and a personality disorder. She further concluded that the plaintiff had only slight restriction of activities of daily living and maintaining social functioning, but "often" had difficulty with concentration, persistance or pace resulting on the failure to complete tasks in a timely manner. J.A. at 228–33. Dr. Kadle concluded that the plaintiff "retains the [mental residual functional capacity] for simple and multi-step tasks of a routine, non-academic nature. She is capable of social pleasantries & overall, would interact appropriately [with] co-workers & supervisors. A stable & predictable environment may minimize her vulnerability to stress." J.A. at 237.

On April 17, 1997, Dr. Willa L. Caldwell, a state agency physician, reviewed the medical evidence in the record and concluded that the plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, could stand about 6 hours in an 8–hour workday, and sit about 6 hours in an 8–hour workday. J.A. at 218. Dr. Robert A. Wisenburger also reviewed the medical evidence and concurred with Dr. Caldwell's opinion. J.A. at 224.

In September 1997, the plaintiff underwent a psychological evaluation by Dr. Anthony Golas. J.A. at 307. Dr. Golas noted

the plaintiff's depression and stated that the plaintiff "does not feel she can return to her previous job since the store closed and she has not thought of any alternatives." J.A. at 307.

On November 6, 1997, the plaintiff began to treat with Dr. Nancy A. Sukys, a family practitioner. The plaintiff's initial complaint was left-sided back pain, for which she was taking Darvocet. Dr. Sukys noted that the plaintiff suffered from fibromyalgia, a bulging disc, and lumbar strain, but also stated that her exercise was "active at home." J.A. at 349. Dr. Sukys' treatment notes indicate that the plaintiff was involved in a motor vehicle accident on November 10, 1997. J.A. at 350. Two days later, Dr. Sukys found that the plaintiff had "full range of motion" in her neck with "discomfort on moving her head." *Ibid.* Dr. Sukys diagnosed "cervical strain" and recommended that the plaintiff wear a cervical collar for five days and not do "any heaving lifting or strenuous activities." *Ibid.* Dr. Sukys referred the plaintiff to physical therapy on December 31, 1997 for further evaluation and management of neck pain, upper back pain, and headaches. J.A. at 342.

In March 1998, the plaintiff was discharged from physical therapy because she was "plateauing." J.A. at 332. However, she was re-evaluated in April 1997 for management of cervical pain, right temporomandibular joint (TMJ) pain, and shoulder pain. J.A. at 328.

On April 21, 1998, the plaintiff went to the hospital complaining of chest pain. She was admitted, and the history and physical report states that the plaintiff, "who has a known history of fibromyalgia but states she was doing fairly well until the morning of this admission when she was resting at home, … developed sudden episode of sharp, left-sided chest pain at the beginning and which was radiating

down left arm accompanied by some shortness of breath." J.A. at 323. An electrocardiogram showed an "inferior myocardial infarction age undetermined," J.A. at 324, but an "exercise stress echo" performed on April 23, 1998 by Dr. Richard F. Terry, although showing an incomplete right bundle branch block was interpreted as a "normal study," J.A. at 353, 355, and the plaintiff was discharged that day.

On May 13, 1998, Dr. Sukys noted that the plaintiff had tender points on her neck, elbows, and knees. J.A. at 321. Dr. Sukys noted a history of fibromyalgia and prescribed Prozac and multivitamins, and recommended aquatic exercises. J.A. at 321. In June 1998, during a follow-up visit, Dr. Sukys noted that the fibromyalgia was stable on Prozac. J.A. at 320.

The plaintiff resumed physical therapy in August 1998. J.A. at 372. The plaintiff complained of jaw, neck and shoulder pain, and headaches. J.A. at 372. The plaintiff was again discharged from physical therapy in November 1998. J.A. at 382. The plaintiff's final diagnosis was "cervical strain and bilateral shoulder pain." J.A. at 382. The physical therapist noted that "[i]t is expected that Mrs. Bartyzel will continue to have some level of neck and shoulder pain." J.A. at 382.

At the administrative hearing, the plaintiff testified that she attended school through the tenth grade and subsequently received her GED with the help of a friend. J.A. at 401–02. The plaintiff stated that she is unable to work because she cannot sit or stand for long periods of time and cannot read or spell very well. J.A. at 407. She testified that she could lift ten to twenty pounds with both hands, and she could not walk on concrete, but could walk on grass or soft surfaces. J.A. at 416–17. The plaintiff stated that she drives six times a week to go grocery shopping or to physical therapy, although the total dis-

tance is not more than five miles each way. J.A. at 412–13. She is able to care for her personal needs and performs some light housekeeping. J.A. at 414. She can also push a lawnmower, but cannot pull the starter. J.A. at 425. The plaintiff further testified that she frequently drops "things" because she does not "have the feeling in [her] hands [she] used to have." J.A. at 424. She also has problems with concentration and with her memory. J.A. at 419. The plaintiff testified she still has problems with depression and is taking Prozac. J.A. at 418.

Helen Kopral, the plaintiff's aunt, testified that she helps the plaintiff clean her house, balance her checkbook, and read. J.A. at 427–28. She walks with the plaintiff for exercise a few days a week and they normally walk about two miles. J.A. at 430–31.

Larry Bell, a vocational expert, testified and was asked by the ALJ if there were any jobs available for an individual of the plaintiff's age, education and past relevant work experience who would be limited to performing sedentary and light work, with a sit/stand option, no more than occasional stooping and crouching, and no repetitive bending. The ALJ also asked Bell to assume the individual would be limited to simple, routine and repetitive work involving one and two step instructions, no reading or writing, in a low strees, low pressure work environment that requires few independent decisions and little opportunity for confrontation. Bell testified that the jobs of locker room attendant, half of the small parts assembler positions, and sedentary jobs such as hand packer and security service monitor, were readily available. J.A. at 434. Bell testified these jobs were available even if the plaintiff could not make change and assuming the restrictions of no extended walking on concrete, no fine dexterity or handling of fragile objects, a need to lie down for up to an hour a day during scheduled breaks, and no work around heights or dangerous machinery or other hazards. J.A. at 435.

The plaintiff's attorney asked Bell if the same jobs would be available to the hypothetical individual if he were to further assume that the individual is "often deficient in concentration, persistence or pace resulting in a failure to complete task in a timely manner." J.A. at 436. Bell testified that the jobs would no longer be available under that hypothetical. J.A. at 437.

As noted above, the ALJ did not accept the plaintiff's testimony describing her own limitations, and held instead that the plaintiff could perform some work. The district court found substantial support in the record for the conclusion that the plaintiff was not disabled within the meaning of the Social Security Act.

## II.

The social security system established by Congress is comprised of an administrative level at which claims are adjudicated, and a judicial level at which administrative decisions are reviewed by the federal courts solely to determine if they are within statutory authority and are not arbitrary and capricious. *See Sullivan v. Zebley,* 493 U.S. 521, 528, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). At the administrative level, the state agency, pursuant to authority delegated by the Social Security Administration, makes the initial determination and processes the first appeal. *See Bowen v. Yuckert,* 482 U.S. 137, 142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The district court's task in reviewing a Social Security disability determination is a limited one. The ALJ's findings are conclusive if they are supported by substantial evidence, according to 42 U.S.C. § 405(g). Consequently, the court's re-

view is confined to determining whether the correct legal standard was applied, and whether the findings are supported by substantial evidence on the whole record. *See Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir.2003). " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Kirk v. Sec. of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The Court may not base its decision on a single piece of evidence and disregard other pertinent evidence when evaluating whether substantial evidence exists in the record. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir.1978). Thus, where the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record might support a contrary conclusion. *Smith v. Sec. of Health & Human Servs.,* 893 F.2d 106, 108 (6th Cir.1989). We have stated that the role of the court "is not to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony." *Wright,* 321 F.3d at 614. Therefore, the court "may not try the case *de novo,* nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984).

"The court of appeals reviews the district court's conclusion in social security cases *de novo,* and directly reviews the Secretary's findings and conclusions as if it were the first reviewing court. The court must affirm the Secretary's decision if supported by substantial evidence." *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir.1990).

### A.

The plaintiff challenges the ALJ's conclusion that she could perform a restricted range of light work. According to 20 C.F.R. § 404.1567(b), "light work"

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The plaintiff points to a lifting capacity report that "recommend[s]" that she should be able to frequently lift 12 pounds from ten inches to forty inches, 7 pounds from table-level to shoulder-level, and 7 pounds from the floor to thirty inches. J.A. at 203. However, that same report shows actual test results demonstrating the plaintiff's ability to lift considerably more than the recommended amounts, and it proves that the plaintiff had the ability to perform at the "light" exertional level.

Likewise, Dr. Fleck and chiropractor Bentley both opined that the plaintiff could perform "light duty" work. J.A. at 196, 268. The plaintiff contends that the ALJ misinterpreted Dr. Fleck's opinion because it was conditioned on the "likely require[ment of] vocational intervention." J.A. at 247. However, Dr. Fleck's qualifications as indicated in the record were limited to assessing the plaintiff's functional limitations as limited by her physical impairments; she did not exhibit any vocational expertise. Furthermore, Dr. Fleck consistently opined that the plaintiff had

the physical capability to perform light work. Nor is the plaintiff aided in her argument by the statement of chiropractor Bentley that the plaintiff "remains temporarily, totally disabled." J.A. at 268. This statement was made in the context of the unavailability of light work at the time; Dr. Bentley acknowledged in that same letter that he had "previously released [the plaintiff] to light duty." *Ibid.* Moreover, under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity" due to a "physical or mental impairment" that could cause death or might reasonably be expected to last continuously for at least twelve months. *See* 42 U.S.C. § 423(d)(1)(A). There is no explanation in the record as to the meaning of "temporary" total disability, but the plaintiff has the burden to prove a disability, *see Boyes v. Sec'y of Health & Human Servs.,* 46 F.3d 510, 512 (6th Cir.1994), and it is reasonable to find that "temporary" disability will not satisfy the twelve-month statutory durational requirement.

█ The plaintiff also contends that the ALJ did not ask a complete hypothetical question to the VE because the ALJ failed to include other impairments such as cardiac pain, TMJ pain, headaches, fibromyalgia, epicondylitis, and severe anxiety; and the ALJ disregarded the limitations to which the plaintiff and her aunt testified. It is well established that assessment of residual functional capacity for work must be made only after all of a claimant's limitations have been taken into account. 20 C.F.R. § 416.945. Further, a hypothetical question posed to a vocational expert must include a "complete assessment of [the claimant's] physical and mental state and should include an accurate portrayal of her individual physical and mental impairments." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 239 (6th Cir.2002) (internal

quotes and alterations omitted) (quoting *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir.1987)). However, the plaintiff points to no functional limitations arising from the diagnoses mentioned above, except those that she, herself, described in testimony that the ALJ did not find fully credible. The rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts. In fashioning the hypothetical question to be posed to the vocational expert, the ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir.1993). "[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability," and "can present a hypothetical to the [vocational expert] on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).

We conclude that the ALJ's credibility determination was reasonable, the hypothetical question posed to the VE was proper, and substantial evidence supported the ALJ's RFC determination.

**B.**

█ The plaintiff, however, argues that rejection of her testimony concerning subjective complaints of pain was improper because the ALJ did not follow the Commissioner's protocol. Although subjective complaints of pain may be sufficient to support a claim of disability. *see Glass v. Sec'y of Health, Educ. & Welfare,* 517 F.2d 224, 225 (6th Cir.1975), Congress has stated that "there must be medical signs and

findings, established by medically acceptable or clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain." 42 U.S.C. § 423(d)(5)(A). We have prescribed an analytical framework for evaluating subjective complaints of pain:

First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 853 (6th Cir.1986).

This is consistent with the Secretary's own rules. Under 20 C.F.R. § 404.1529(b), the plaintiff must establish an underlying medical condition, and then show either (1) that objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) the medical condition, objectively determined, is at a level of severity which can reasonably be expected to give rise to the alleged pain. If the plaintiff satisfies this burden, the ALJ must then evaluate the intensity and persistence of the plaintiff's pain symptoms in light of objective medical evidence including the activity which precipitates or aggravates the plaintiff's symptoms, the plaintiff's daily activities, the intensity and duration of her symptoms, and medications, treatment and other means to relieve the symptoms. 20 C.F.R. § 404.1529(c).

The plaintiff argues that there is evidence in the record that satisfies the elements of the *Duncan* test. That argument, however, is wide of the mark. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001). Here, the ALJ found that the objectively-established, underlying medical conditions *could* cause pain. The ALJ concluded, however, that the plaintiff overstated her disability due to pain and therefore he discounted her testimony. In evaluating a claimant's complaints of pain, the ALJ quite properly may consider the claimant's credibility. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997); *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981). The ALJ relied on permissible factors in reaching this conclusion, including the statements of the plaintiff's treating doctors, physical capacity test results, medical diagnostic test results, and the plaintiff's own description of her activities of daily living. J.A. at 70–71. The ALJ's decision concerning credibility was supported by substantial evidence on this record.

C.

▇ The plaintiff also contends that her diagnosis of fibromyalgia constitutes a listing level impairment, specifically Listing 14.06, which addresses undifferentiated connective tissue disease. That Listing states:

Undifferentiated connective tissue disorder (14.06)This listing includes syndromes with clinical and immunologic features of several connective tissue disorders, but that do not satisfy the criteria for any of the disorders described; for instance, the individual may have clinical features of systemic lupus erythematosus and systemic vasculitis and the serologic findings of rheumatoid arthri-

tis. It also includes overlap syndromes with clinical features of more than one established connective tissue disorder. For example, the individual may have features of both rheumatoid arthritis and scleroderma. The correct designation of this disorder is important for assessment of prognosis.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.06.

Once again, the plaintiff's argument is wanting, and she has not met her burden to prove that she should prevail at step three of the sequential analysis. *See* 20 C.F.R. § 404.1520(d). Fibromyalgia has been said to constitute a diagnosis by limitation, *see Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817–18 (6th Cir.1988) ("As set forth in the two medical journal articles ... fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances.... [I]t is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients."). However, the Secretary has noted that chronic fatigue syndrome and fibromyalgia are medically determinable and that the existence of certain symptoms, including the presence of focal trigger points, may be sufficient to establish the diagnosis. *See* Social Security Ruling (SSR) 99–2p ("CFS [chronic fatigue syndrome] is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity. The current case criteria for CFS, developed by an international group convened by the Centers for Disease Control and Prevention (CDC) as an identification tool and research definition, include a requirement for four or more of a specified list of symptoms. These constitute a patient's complaints as reported to a provider of treatment. However ... [d]isability may not be established on the basis of an indi-

vidual's statement of symptoms alone."). According to SSR 99–2p, the manifestations of fibromyalgia and CFS are:

[T]he presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities. Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:

Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;

Sore throat;

Tender cervical or axillary lymph nodes;

Muscle pain;

Multi-joint pain without joint swelling or redness;

Headaches of a new type, pattern, or severity;

Unrefreshing sleep; and

Postexertional malaise lasting more than 24 hours.

Within these parameters, an individual with CFS can also exhibit a wide range of other manifestations, such as muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty com-

prehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety).

The Ruling also addresses the requirement of Sections 223(d)(3) and 1613(a)(3)(D) of the Social Security Act and 20 C.F.R. §§ 404.1508, 416.908, that evidence of an impairment must include objective clinical or laboratory manifestations.

> For purposes of Social Security disability evaluation, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months establishes the existence of a medically determinable impairment for individuals with CFS:
>
>> Palpably swollen or tender lymph nodes on physical examination;
>>
>> Nonexudative pharyngitis;
>>
>> Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or,
>>
>> Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

SSR 99–2p (footnote omitted). The Ruling also recognizes that at the present time, there are no laboratory findings that are accepted as confirmatory of CFS. However, the following findings will be sufficient, although not required, to establish a medically determinable impairment under the Act:

> An elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640;
>
> An abnormal magnetic resonance imaging (MRI) brain scan;
>
> Neurally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing; or,

> Any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record; for example, an abnormal exercise stress test or abnormal sleep studies, appropriately evaluated and consistent with the other evidence in the case record.

*Ibid.*

A person with a condition of fibromyalgia certainly could have serious enough pain to have a disability under the Social Security Act, but the condition does not automatically qualify as a listing level impairment. The record in this case does not support a conclusion that the plaintiff's fibromyalgia was of the severity as outlined in SSR 99–2p, or contained any of the disabling features that met or equaled in severity the impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00, including Listing 14.06. Moreover, although Dr. Sukys diagnosed fibromyalgia in May 1998, she noted that it was stable on Prozac. *See* J.A. at 320. Dr. Sukys did not indicate that the plaintiff's fibromyalgia was disabling. The plaintiff has not sustained her burden of establishing disability through a listing-level impairment.

### D.

■ The plaintiff also argues that the ALJ improperly limited the plaintiff's counsel's examination of the VE by requiring the cross-examination to be limited to vocational terms. The ALJ began the direct examination of the VE by propounding a hypothetical involving certain limitations. The plaintiff's counsel interjected.

> ATTY: Your Honor, can I object to your hypothetical?
>
> ALJ: No, you can add something to it or you can give your own hypothetical but that's my own hypothetical. If

you want to state an objection for the record you can do it.

ATTY: Yeah, my objection is it doesn't meet several key elements that are indicated by the testimony and record including inability to make change, often deficient in concentration and persistence and pace; concentration and attention problems, than you.

J.A. at 433–34. The ALJ then asked the VE to given examples of jobs available and the VE gave his opinion. The ALJ asked the VE to assume a second hypothetical with the same limitations as the first plus an addition restriction that the individual was unable to make change. J.A. at 434. This was one of the factors in the plaintiff's counsel's objection. The VE assumed that additional restriction and found that it did not change his opinion of the jobs available. J.A. at 434–35.

On cross examination, the following colloquy took place:

ATTY: If you add to the last hypothetical someone who is often deficient in concentration, persistence or pace resulting in a failure to complete task in a timely manner would that have any effect -

ALJ: Okay, I'm not going to allow that question. What I will allow you to do is quantify that somehow in some [kind] of more precise vocational terms. I recognize that that's on the PRTF form but my understanding of the role of boxes in the PRTF from is that it includes everything above non-significant to below listing level. That's a very broad range that essentially allows that vocational expert— asking him the question allows the vocational expert to arrive at a residual functional capacity with respect to that. So if you can somehow try to quantify the frequency of the lapses of

concentration, persistence and pace in more precise terms.

ATTY: I'll give it a shot, Your Honor. Can I assume that a failure to complete tasks in a timely manner would render the hypothetical person unable to perform any of the jobs that you've indicated?

VE: Definitely would in the hand packer and locker room attendant and small parts assembler. Security surveillance monitor that would be affected if there were a problem and she couldn't respond to it.

J.A. at 436–37.

The district court stated that the plaintiff's argument that her cross-examination was improperly limited "border[s] on the frivolous." We do not share that assessment. A question that incorporates the Secretary's own terminology is not improper, particularly if the witness is able to understand it and quantify the term for the purpose of an answer. It is also proper, and perhaps more effective, for the questioner to attempt to quantify the Secretary's terminology in order to obtain a more precise opinion of the available jobs given a claimant's specific limitations. *See Bankston v. Comm'r of Soc. Sec.*, 127 F.Supp.2d 820, 827 (E.D.Mich.2000) (suggesting that the term "often" indicates a deficit that occurs more than fifty percent of the time).

There is no basis on this record, however, to reverse the findings of the Commissioner or remand for additional testimony from the VE. The plaintiff's attorney was able to make the relevant inquiry, and the ALJ's instruction to rephrase the question did not limit the attorney's ability to effectively cross-examine the VE.

### III.

The ALJ's finding that the plaintiff was not disabled on the basis of the January

31, 1997 application for disability insurance benefits is support by substantial evidence on the record viewed in its entirety, as the district court correctly concluded. Accordingly, the district court's judgment in favor of the Commissioner is AFFIRMED.