Martha **DICKEY–WILLIAMS,**
Plaintiff,

v.

**COMMISSIONER OF SOCIAL
SECURITY, Defendant.**

Case No. 12–cv–12220.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2013.

Daryl C. Royal, Dearborn, MI, for Plaintiff.

Allen Duarte, Jessie Wang–Grimm, Social Security Administration, Chicago, IL, Vanessa Miree, U.S. Attorney's Office, Eastern District of Michigan, Detroit, MI, for Defendant.

***ORDER OVERRULING OBJECTIONS AND ADOPTING REPORT AND RECOMMENDATION*** *(document no. 13),* ***GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*** *(document no. 12),* ***DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*** *(document no. 9),* ***AND DISMISSING CASE***

STEPHEN J. MURPHY, III, District Judge.

The Social Security Administration ("SSA") denied Plaintiff and claimant Mar-

tha Dickey–Williams' application for Supplemental Security Income in a decision issued by Administrative Law Judge ("ALJ") Deborah Rose on October 26, 2010. After the SSA Appeals Council declined to review the decision, Dickey–Williams appealed to this Court. The Court referred the matter to a U.S. Magistrate Judge, and the parties filed cross motions for summary judgment. On April 30, 2013, the magistrate judge issued a Report and Recommendation ("Report") suggesting denying Dickey–Williams' motion and granting the Commissioner for Social Security's ("Commissioner") motion. Report, ECF No. 13.

Dickey–Williams filed three timely objections to the Report. She argues the Report improperly dismissed the ALJ's failure to apply the treating physician rule to the opinions of Dr. Clague; the Report did not properly consider the opinions of psychologist Ross Thayer; and the report overlooked the ALJ's failure to discuss whether Dickey–Williams' migraines affected her residual function capacity. Objection at 2–7, ECF No. 14.

Civil Rule 72 does not require the Court to hold a hearing when reviewing a magistrate judge's findings. Fed.R.Civ.P. 72; *U.S. v. Raddatz*, 447 U.S. 667, 674, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (holding 28 U.S.C. § 636 did not require a hearing for de novo review of a magistrate's findings); *see also Estate of Wyatt v. WAMU/JP Morgan Chase Bank*, 09–14919, 2012 WL 1622897 (E.D.Mich.2012). After examining the record and considering Dickey–Williams' objections de novo, the Court concludes that her objections do not have merit. Accordingly, the Court will adopt the Report, grant the Commissioner's motion for summary judgment, deny Dickey–Williams' motion for summary judgment, and dismiss the case.

## STANDARD OF REVIEW

Reports and recommendations for dispositive motions issued by a magistrate judge are reviewed pursuant to Civil Rule 72(b). The district judge referring the motion is only required to perform a de novo review of the magistrate judge's findings if the parties "serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2). Here, Dickey–Williams objected to three findings made by the Report as to the ALJ's decision. Those findings will be reviewed de novo by the Court.

Judicial review of decisions by the Commissioner is authorized by 42 U.S.C. § 405(g). A reviewing court only examines an ALJ's determination to see if it is "supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.2007). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Therefore, a review of the Commissioner's decision gives great deference to an ALJ's findings. A court should not replace an ALJ's judgment of the facts with its own view of the evidence unless an ALJ's finding is completely without support. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679 (6th Cir.1989) ("We do not review the evidence de novo, make credibility determinations nor weigh the evidence."). If an ALJ's decision is supported by substantial evidence, the Court must accept the finding, even if substantial evidence would support a different finding as well. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.2007).

## BACKGROUND

Martha Dickey–Williams was fifty years old at the date of the most recent administrative decision. Her previous work history included various jobs with an automotive manufacturer for twenty years. Report at 2. During this work, she claimed she had developed underlying overuse syndrome, or repetition strain injuries, of her upper extremities due to the nature of her job. According to her, she was first diagnosed with bilateral carpal tunnel syndrome, as well as left DeQuervain's tendinitis, in February of 1991. Pl's Mot. for Summ. J. at 3, ECF No. 9. Over the subsequent years, she returned to several doctors with similar symptoms and diagnoses, including doctors retained by her employer. Her work responsibilities were modified in part because of these diagnoses. *Id.* at 6. Eventually, Dickey–Williams went into disability retirement due to her medical issues from her employer on November 18, 2005. She then filed an application for disability insurance benefits on May 19, 2008, alleging a disability onset date of November 18, 2005. On September 2, 2010, ALJ Rose held a video hearing with Dickey–Williams. Dickey–Williams was present in Lansing, Michigan, and ALJ Rose presided from Tulsa, Oklahoma; a Vocational Expert also appeared at the hearing. On October 26, 2010, the ALJ concluded Dickey–Williams was not disabled, and denied her claim. The Social Security Appeals Council declined to review her decision, and Dickey–Williams filed suit in this Court.

## I. *The ALJ's Decision*

When applying for disability benefits, a claimant has the burden to establish an entitlement to benefits. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir.1992). In reviewing an application, an ALJ must examine the evidence using the five step evaluation process specified by 42 U.S.C. § 423 and 20 C.F.R. § 404.1520. The "claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.2004). If the claimant can establish an entitlement to benefits at any step, the inquiry ends and the claimant is entitled to benefits.

First, the ALJ must determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b). Here, the ALJ found Dickey–Williams had been, for the purposes of the regulations, medically "laid off" from her employment at the claimed date of the disability onset, and had not engaged in substantial gainful activity since then. ALJ Decision at 3.

Second, the ALJ must determine whether the claimant suffers a "severe impairment" that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Here, the ALJ found Dickey–Williams suffered from severe impairments of tendonitis, "status post carpal tunnel release of thumb," and depression. ALJ Decision at 3.

Third, the ALJ must determine whether the claimant can prove the impairment "meets or equals" an impairment category found in the Social Security listing at 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. If a claimant meets one of these categories, the claimant is considered disabled regardless of age, education, or work experience considerations. 20 C.F.R. § 404.1520(d). Here, the ALJ found Dickey–Williams did not have an impairment or combination of impairments that met or equaled one of the listings found in either Appendix 1, section 1.01, musculoskeletal impairments, or section 12.04, mental disorders.

To meet or equal a 1.01 listing, a claimant must suffer from one of several different types of disorders, which generally result in an inability to ambulate effectively, or an inability to perform fine and gross movements. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.01–1.02. Although the ALJ acknowledged that Dickey–Williams had back, shoulder, arm, and hand pain, and was limited in her work, the ALJ also noted the medical evidence did not support "spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or a verbal fracture." ALJ Decision at 4. Nor did the medical evidence show fracture of an upper extremity, lumbar spinal stenosis, or the inability to ambulate effectively. Thus, under the guidelines of 1.01, the ALJ concluded Dickey–Williams did not meet or equal any listed musculoskeletal impairment.

To meet or equal a 12.04 listing, a claimant must meet both "paragraph A" and "paragraph B" criteria. Although the ALJ determined Dickey–Williams met paragraph A criteria of a severe mental impairment, namely a "depressive disorder not otherwise specified," *id.* at 5, the ALJ also concluded she did not meet the criteria of paragraph B, which requires showing at least two of the following symptoms:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, ¶ B. The ALJ found that Dickey–Williams only had moderate restrictions in daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration; and no documented episodes of decompensation. ALJ Decision at 6.

Listing 12.04 may also be met if the claimant alternatively meets "paragraph C" criteria. The ALJ found that Dickey–Williams did not meet the criteria of paragraph C, which requires a finding of:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

§ 12.04, ¶ C. Here, the ALJ found the medical record did not establish a chronic affective disorder of at least two years that caused more than a minimal limitation of her ability to do basic work activities; or in combination with the remaining three factors. ALJ Decision at 6.

Fourth, if, as here, the claimant cannot meet or equal one of the listed entries, the ALJ will make a determination of the claimant's "residual functional capacity" to engage in work, and the claimant must show she cannot engage in work she has performed in the past. In making this determination, the ALJ will consider all the relevant evidence. The ALJ must first conclude there is an underlying medical impairment capable of producing the claimant's symptoms, and then make a

judgment as to the intensity, and limiting effects of the symptoms on the claimant's ability to work. The ALJ uses this judgment to determine a claimant's residual functional capacity. 20 C.F.R. § 404.1520(e).

The ALJ concluded Dickey–Williams had the residual function capacity to perform a "restricted range of light and sedentary work" which encompassed the ability to lift or carry ten pounds occasionally; stand or walk for six hours in an eight-hour workday; the inability to do any climbing of ladders, ropes, or scaffolds; occasional working at or above the shoulder level; occasional gross and fine manipulation; and simple, routine tasks. ALJ Decision at 7. In making this determination of her physical and mental limitations, the ALJ considered a wide variety of evidentiary sources, including Dickey–Williams' testimony; the physical limitation opinions of Dr. Alan Clague, Dr. Neal Bente, Dr. D. Biscardi; the mental limitation opinions of Dr. John Gallagher, and Ross Thayer. *Id.* at 9–11.

Fifth, the ALJ must determine, based on the residual function capacity and the claimant's age, work experience, and education, whether the claimant can engage in other work that is available in the national economy. 20 C.F.R. § 404.1520(f). The ALJ found that Dickey–Williams was unable to perform any of her past work, defined as a data entry clerk and a receiving clerk. The ALJ also concluded that transferability of work skills from her previous work was irrelevant here. Considering this background, and Dickey–Williams' residual function capacity, the ALJ found Dickey–Williams was qualified to engage in light work with additional limitations. The Vocational Expert testified that given these factors, possible unskilled and light exertional jobs included counter clerk and school bus monitor, both of which existed

in substantial numbers in the regional economy. ALJ Decision at 13. The ALJ then concluded that Dickey–Williams was "not disabled" as defined by the Social Security Act. *Id.*

The Report recommended granting summary judgment to the Commissioner, finding that the ALJ's decision was supported by substantial evidence. Report at 26. Pursuant to 28 U.S.C. § 636(b)(1), Dickey–Williams filed an objection to the report on April 2, 2013; on April 10, 2013, the Commissioner filed a response.

## DISCUSSION

### I. *Application of the Treating Physician Rule to Dr. Clague*

■ Dickey–Williams' first objection to the Report disagrees with the Report's discussion of the ALJ's consideration of Dr. Clague's opinions. The ALJ did not give all of the opinions of Dr. Clague, one of Dickey–Williams' treating physicians, substantial or controlling weight; the Report concluded the ALJ had substantial evidence to support this decision. Dickey–Williams argues the Report misapplied the treating physician rule by not requiring the ALJ to clearly explain the reasons for not according Dr. Clague's position greater weight.

### A. *Legal Standards*

■ Title 20 C.F.R. § 404.1527 specifies how an ALJ must evaluate medical opinion evidence. The ALJ must adhere to these standards as a matter of due process. *Wilson,* 378 F.3d at 544. An ALJ is required to give controlling weight to the opinions of a treating source if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If

the ALJ chooses not to give a treating source controlling weight, the ALJ must still "apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Wilson,* 378 F.3d at 544.

■ Normally, an ALJ's failure to follow this rule is an error which may constitute a lack of substantial evidence. "[C]ourts have remanded the Commissioner's decisions when they have failed to articulate 'good reasons' for not crediting the opinion of a treating source, as § 1527(d)(2) requires." *Id.* at 545. But this error is not always dispositive, and may be considered "harmless error" if: "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) ... even though she has not complied with the terms of the regulation." *Cole v. Astrue,* 661 F.3d 931, 940 (6th Cir.2011) (quoting *Wilson,* 378 F.3d at 547) (internal citation omitted). But the "ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error where [the court] cannot engage in 'meaningful review' of the ALJ's decision." *Blakley v. Comm'r Of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir.2009) (quoting *Wilson,* 378 F.3d at 544).

### B. *Dr. Clague's Assessment*

Dr. Allan Clague, a clinical neurologist, examined Dickey–Williams several times between 2008 and 2010. Administrative Record ("A.R.") at 332, 463, 534, 550. For each of Dr. Clague's examinations on June 4, 2008, May 2, 2008, September 3, 2008, December 9, 2008, March 12, 2009, June 18, 2009, March 16, 2010, and July 30, 2010, Dr. Clague prepared a multi-page letter explaining the results of his examination and his medical opinions as to Dickey–Williams' condition. Dr. Clague's reports are generally consistent; for example, the most recent opinion, on July 30, 2010, states, among other things, that Dickey–Williams continued to suffer from an "underlying overuse syndrome [repetition strain injury (RSI)] of both upper extremities from prolonged repetitive muscular activity ... 1) bilateral carpal tunnel syndrome ... 2) deQuervain's syndrome (extensor tenosynovitis) left thumb; 3) bilateral epicondylitis; 4) bilateral periarthritis of the shoulders; and 5) traction/stretch/compression injury to the brachial plexuses: left and right." A.R. at 541. Dr. Clague also concluded that Dickey–Williams' condition was a direct result of her employment on an assembly line; that her prognosis was poor as "continued repetitive use of the upper extremities will only result in further progression"; and that a "conservative medical management" treatment was appropriate. He also, as Dickey–Williams points out, concluded that "I never foresee her being able to return to any form of gainful productive employment." *Id.* at 542.

### C. *Analysis*

Dickey–Williams' objection to the Report has less to do with substantive objections to the ALJ's decision than with the procedural objections. Citing *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365 (6th Cir.2013), Dickey–Williams argues that when refusing to give controlling weight to a treating source, an ALJ must give

good reasons for discounting the weight given to a treating-source opinion.... These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This procedural requirement ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Id.* at 376 (internal citations and quotation marks omitted). Dickey–Williams argues that the ALJ here failed to do so, only stating perfunctorily that she did "not give significant weight to Dr. Clague's assessment because the particulars of the assessment are not supported by the whole of the evidence and are not well supported by objective or other evidence." ALJ Decision at 20. Dickey–Williams points out that in *Gayheart*, the Sixth Circuit held in that case an ALJ's similar statement that a treating source's opinions "are not well-supported by any objective findings" was "ambiguous" at best and insufficient to be a good reason. *Gayheart*, 710 F.3d at 377.

As a threshold matter, the Court must determine what precisely the ALJ chose to credit or discredit. As Dickey–Williams correctly states, Dr. Clague examined her several times over a two year period and authored several medical opinions regarding her physical state. On August 12, 2010, Dr. Clague, in response to a request from Dickey–Williams' counsel, also authored a medical source statement (physical) listing his assessment of Dickey–Williams' functional capacities. This source statement is the source of most of Dr. Clague's claimed limitations. A.R. at 551. In the ALJ's Decision, when the ALJ chose to give less than controlling weight to "Dr. Clague's assessment," it is clear that the ALJ is only speaking to the

specific medical source statement and its opinions as to Dickey–Williams' residual function capacity, not the entirety of Dr. Clague's medical opinions.

To the extent the ALJ chose to give less than controlling weight to Dr. Clague's overall conclusions that he will "never foresee [Dickey–Williams] being able to return to any form of gainful productive employment," A.R. at 340, and his subsequent conclusion that she is "totally and permanently medically disabled," A.R. at 554, the ALJ was warranted in disregarding these conclusions. "[T]he ultimate issue of disability is reserved to the Commissioner." *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir.2008). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009); *see* 20 C.F.R. §§ 404.1546(c), 416.946(c). Nor is an ALJ "required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id.* And an "ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

Thus, examining the ALJ's choice to only give less than significant weight to Dr. Clague's medical source statement, and his assessment of Dickey–Williams' residual function capacity therein, the Court concludes that the ALJ had substantial evidence to give the source statement the weight she did; and that even if the ALJ did not fully comply with § 404.1527, it is harmless error because the Court was capable of engaging in meaningful appellate review of her decision.

First, the ALJ did give a reason for why she chose not to accord Dr. Clague's medical source statement controlling weight:

she determined that "the particulars of the assessment are not supported by the whole of the evidence and are not well supported by objective or other evidence." At its core, the regulations at least facially permit an ALJ to give an opinion less than controlling weight if an opinion is inconsistent or not well-supported. *See* 20 C.F.R. § 404.1527 (controlling weight is granted if an opinion is both "well-supported" *and* is "not inconsistent with the other substantial evidence"); *see, e.g., Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 877 (6th Cir.2007).

Contrary to Dickey–Williams' objection, the ALJ's decision was more specific than the "ambiguous" statement referred to in *Gayheart.* In *Gayheart,* the phrase "not well-supported by any objective findings" was considered ambiguous because, in context, it was unclear to what evidence "objective findings" referred to—was it nonobjective findings, or merely objective findings that did not support the opinion? *Gayheart,* 710 F.3d at 377. Here, in contrast, the ALJ was more specific: Dr. Clague's medical source statement was not accorded controlling weight because (1) the whole of the evidence did not support Dr. Clague's statement, (2) objective evidence did not support Dr. Clague's assessment, and (3) other evidence did not so support either.

It is true the ALJ did not immediately enumerate specifically what evidence conflicted with Dr. Clague's medical source statement. It is also true the general phrase that an opinion is "not supported" or "inconsistent," without more, may not always be sufficient. But this is not a case in which the Court could not determine, under the principles of "meaningful [appellate] review of the ALJ's decision," *see Blakley,* 581 F.3d at 409, what evidence the ALJ relied on to substantiate her conclusion of less than controlling weight. And this is not a case in which the ALJ

failed to consider at all a treating source, or discredit a treating source entirely. *Cf. Blakley,* 581 F.3d at 408. The ALJ thoroughly examined Dr. Clague's opinion. And the substantial evidence the ALJ relied on not only existed, *cf. Blakley,* 581 F.3d at 410 (6th Cir.2009) ("substantial evidence alone does not excuse non-compliance"), but was discussed at length in the ALJ's Decision.

Here, the medical evidence the ALJ relied on—as the Report, the response to the objection, and the Court's examination of the ALJ's decision and the Administrative Record make clear—include: the internal contradiction between Dr. Clague's medical source statement, and his prior medical opinions, ALJ Decision at 4 (citing A.R. at 468), *see Coldiron v. Comm'r of Soc. Secy.,* 391 Fed.Appx. 435, 440 (6th Cir.2010) (internal inconsistency reason to afford less than controlling weight to treating source), as well as the fact Dr. Clague's medical source statement and opinions did not rely on electrophysiological examinations; the medical opinions and evidence from Dr. Steven Harwood, ALJ Decision at 4 (citing A.R. at 488) and Dr. David Hing, ALJ Decision at 4 (citing A.R. at 265), who had examined Dickey–Williams, *cf. Gayheart,* 710 F.3d at 377 ("conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors"); as well as the contradiction between Dr. Clague's statement and Dickey–Williams' own testimony, ALJ Decision at 9 (citing A.R. at 597). This is sufficient substantial evidence to make Dr. Clague's medical source statement "just one more piece of evidence for the [ALJ] to weigh," *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir.2008). Therefore, substantial evidence existed to support the ALJ's decision; the ALJ was within her "zone of choice" when she chose not to give Dr. Cleague's medical source statement controlling weight. *Felisky v. Bow-*

*en,* 35 F.3d 1027, 1035 (6th Cir.1994). *See generally Kornecky v. Comm'r of Soc. Sec.,* 167 Fed.Appx. 496, 508 (6th Cir.2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.").

Even assuming § 404.1527 required the ALJ here to more specifically detail which pieces of contradictory evidence discredited Dr. Cleague's medical source statement (setting aside the fact the ALJ did enumerate such substantial evidence in the decision), and acknowledging that under § 404.1527, the ALJ may have properly discussed in greater length the weight she did assign to Dr. Cleague's statement, the Court finds that any such error is harmless under the standards of *Wilson v. Comm'r of Soc. Sec.* Failure to comply with the regulations constitutes harmless error if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation." *Watters v. Comm'r of Soc. Sec. Admin.,* 530 Fed.Appx. 419 (6th Cir.2013) (quoting *Cole,* 661 F.3d at 940).

Here, Dr. Cleague's opinion is not patently deficient, nor did the ALJ adopt in whole Dr. Cleague's residual function capacity conclusions. But the Court concludes the ALJ nevertheless met the goals of § 404.1527. The Court understood that the ALJ gave only some weight to Dr.

Clague's medical source assessment, and understood what evidence the ALJ used to conclude the medical source assessment was inconsistent with other evidence. The Court also understood the nature and extent of Dr. Clague's treatment and assessment, as the ALJ discussed it at length, and how Dr. Clague's statements were inconsistent with both his own prior medical evaluations, and the other medical opinions of fellow treating physicians. Thus, the Court was able to conduct a meaningful appellate review of the ALJ's decision, and the goal of § 1527(d)(2) has been met.[1] *See, e.g., Nelson v. Comm'r of Soc. Sec.,* 195 Fed.Appx. 462, 472 (6th Cir.2006). Accordingly, the Court will overrule this objection.

## II. *Consideration of Psychologist Ross Thayer*

Dickey–Williams' second objection to the Report disagrees with the Report's conclusion that there was substantial evidence to support the ALJ's decision to assign less than controlling weight to Ross Thayer's opinion. She argues that the Report improperly considered Dickey–Williams' mental state in the context of "Paragraph B" of listing 12.04, which determines whether a plaintiff meets or equals a listing, when the ALJ should have applied a broader standard when determining residual function capacity. Dickey–Williams also contested the Report's decision to favor Dr. Gallagher's finding of no psychological issues over Thayer's findings Dickey–Williams indeed suffered from these issues multiple times. Finally, Dickey–Williams argues the ALJ Decision and the Report mischaracterized a report authored by Dr. Biscardi.

---

1. The Court warns, however, that failure to more fully adhere to procedural regulations should not become a routine practice of the Commissioner.

## A. *Thayer's Opinion*

Ross Thayer, a psychologist working for the Herrick Outpatient Behavioral Health center, authored a mental impairment questionnaire regarding Dickey–Williams on August 13, 2010, in anticipation of the filing of an application for benefits. A.R. at 543. In his questionnaire, Thayer stated that Dickey–Williams was positive for "chronic depression, anxiety, with poor stress management ability;" that Dickey–Williams exhibited a wide range of signs and symptoms of psychological problems, such as emotional instability, persistent disturbances of mood or affect, catatonic or other grossly disorganized behavior, and similar symptoms; that she was "unable to meet competitive standards" in many areas of work performance; and that she had none or mild restrictions of activities of daily living, but also apparently suffered at least four or more episodes of decompensation within a 12 month period, each of at least two weeks duration. A.R. at 543–547.

## B. *Analysis*

The ALJ chose to give "minimal weight" to the questionnaire because the "Extreme degree of limitation assessed is not corroborated in the contact notes and is not consistent with the whole of the credible probable evidence." ALJ Decision at 11. The ALJ noted that the contact notes for Dickey–Williams' prior treatment, both with Thayer and others, did reflect stress, affective disturbance, anxiety, and depression from life circumstances such as the instant litigation, job loss, and parenthood; but also that there was no corroboration for the "marked difficulties in maintaining social functioning, or the four or more

incidents of decompensation within a twelve-month period." *Id.*

After examining the Administrative Record, the Court concludes the ALJ had substantial evidence to justify assigning the Thayer questionnaire little weight. First, the Thayer questionnaire was internally inconsistent; a finding of no or only mild restrictions in everyday living is incompatible with four or more episodes of decompensation within a 12 month period, each of at least two weeks duration. *See Coldiron,* 391 Fed.Appx. at 440 (internal inconsistency reason to afford less than controlling weight to treating source). This alone would be sufficient to assign the Thayer questionnaire less than controlling weight. The remaining evidence considered by the ALJ included Dickey–Williams' direct testimony to the ALJ and to various social workers in the course of her treatment, ALJ Decision at 5 (citing, e.g., A.R. at 33, 341, 593); the examination and reports of Harold Bilotta and Dr. James Steyaert which, among other things, assessed Dickey–Williams with a similar, but not identical, set of limitations from what Thayer diagnosed, *id.* (citing A.R. at 416); *cf. Gayheart,* 710 F.3d at 377 ("conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors"); the report of reviewing psychologist Dr. John Gallagher, who completed a separate functional limitation assessment, *id.* (citing A.R. at 435, 437); other Herrick Outpatient reports, *id.* (citing A.R. at 594); and the continued description of Dickey–Williams by multiple examiners, including Dr. Clague, as presenting "pleasant and cooperative manner," *id.* (citing A.R. at 332, 416, 463, 483).[2] This is sufficient sub-

---

**2.** It is true that Dickey–Williams did report hallucinations and delusions during her sessions with Thayer, but this does not alter the fact that the ALJ had substantial evidence to discount these reports and choose both to give little weight to Thayer's final report, and to not incorporate the alleged limitations in Dickey–Williams' residual function capacity.

stantial evidence to make Dr. Clague's medical source statement "just one more piece of evidence for the [ALJ] to weigh," *Bauer,* 532 F.3d at 608, and, therefore, substantial evidence existed such that the ALJ was within her "zone of choice" when she chose not to give Thayer's questionnaire controlling weight. *Felisky,* 35 F.3d at 1035.

As for Dickey–Williams' objection that the Report misapplied the legal standard, this is unavailing. It is true the consideration for residual function capacity and the consideration for meeting or equaling a listing in section 12.04 are separate. But this would not alter the conclusion that Thayer's report was internally inconsistent when discussing multiple episodes of decompensation in one part, and finding mild or no restrictions in everyday living in another part. Nor is there anything preventing the ALJ from considering the same sources of evidence in both a meet/equal analysis, and a residual function capacity calculation. Finally, even excluding Dr. Biscardi's report, the ALJ still referred to substantial evidence sufficient to discredit Thayer's questionnaire. The ALJ relied on substantial evidence in not giving Thayer's questionnaire controlling weight; the fact it was the same evidence relied on in determining Dickey–Williams did not meet or equal a 12.04 listing is irrelevant. The Court will overrule this objection.

### III. *Consideration of Dickey–Williams' Migraine Headaches*

 Dickey–Williams' third objection is that the ALJ failed to consider her migraine headaches in formulating his report, and that the Report erroneously claimed it was not an error to do so. She argues that the ALJ is required to discuss this symptom when formulating her resid-

ual function capacity. The objection is also unavailing. First, the Court finds the Report accurately stated the law when holding that an ALJ must consider all of a claimant's symptoms and impairments, severe or non-severe, in formulating a decision (as long as some severe impairment exists). Report at 26 (citing *Anthony v. Astrue,* 266 Fed.Appx. 451, 457 (6th Cir. 2008)). And the fact that the ALJ did not specifically discuss Dickey—Williams' migraines is not dispositive in and of itself. *See Kornecky,* 167 Fed.Appx. at 508 ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"). As long as the final decision incorporates all of the claimant's impairments—and here, the ALJ stated she did consider all of Dickey–Williams' "subjective symptoms and complaints"—the fact an ALJ did not specifically state every piece of evidence or every symptom is not an error. It is true that migraines are noted in the Administrative Record as conditions Dickey–Williams was suffering from. But the primary contention that Dickey–Williams' migraines were disabling was her own testimony. A.R. at 56. And the ALJ stated she found Dickey–Williams' statements regarding the "intensity, persistence, and limiting effects of the limitations [were] not credible" to the extent inconsistent with the other evidence. The ALJ's assessment of a claimant's credibility "are to be given great weight." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir.2007). And as discussed above, the ALJ had the occasion to consider a great deal of medical evidence in formulating Dickey–Williams' residual function capacity. Dickey–Williams has not shown, other than by pointing to its textual absence, how the ALJ would have

*See generally* A.R. at 594 (reports showing no hallucinations or delusions).

altered her residual function capacity assessment and on what evidence that decision would be based. *See Willis v. Comm'r of Soc. Sec.*, 12–10011, 2013 WL 718506 (E.D.Mich. Feb. 27, 2013) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). In other words, the Court finds substantial evidence supported the ALJ's residual function capacity, and Dickey–Williams has not demonstrated, with respect to the migraines, any evidence to show this was in error. The Court will overrule this objection.

### ORDER

**WHEREFORE,** it is hereby **ORDERED** that the Report and Recommendation (document no. 13) is **ADOPTED** over Dickey–Williams' objections.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment (document no. 9) is **DENIED.**

**IT IS FURTHER ORDERED** that the Commissioner's motion for summary judgment (document no. 12) is **GRANTED.** This case is **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [1]

CHARLES E. BINDER, United States Magistrate Judge.

### I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED,** that Defendant's Motion for Summary Judgment be **GRANTED,** and that the findings of the Commissioner be **AFFIRMED.**

### II. REPORT

#### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 12.)

Plaintiff Martha S. Dickey Williams was 50 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 33, 113, 116.) Plaintiff's employment history includes work as an assembler for an auto manufacturer for 20 years. (Tr. at 180.) Plaintiff filed the instant claims on July 31, 2008, alleging that she became unable to work on November 18, 2005. (Tr. at 113, 116.) The claims were denied at the initial administrative stages. (Tr. at 68.) In denying Plaintiff's claims, the Commissioner considered tendonitis and depressive disorder as possible bases for disability. (*Id.*) On

---

**1.** The format and style of this Report and Recommendation are intended to comply with the requirements of the E–Government Act of 2002, Pub.L. 107–347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed.R.Civ.P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07–AO–030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7–108. pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

September 2, 1010, Plaintiff appeared before Administrative Law Judge ("ALJ") Deborah L. Rose, who considered the application for benefits *de novo*. (Tr. at 9–29, 33–67.) In a decision dated October 26, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on November 1, 2010. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543–44 (6th Cir.2004), on March 19, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1–5.) On May 21, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B. Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 890, 107 L.Ed.2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.; Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986) (en banc).

 This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir.2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

 "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir.2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir.2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility' ") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir.2003) (an "ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers*, 486 F.3d at 247 (quoting S.S.R. 96–7p, 1996 WL 374186, at *4).

 If supported by substantial evidence, the Commissioner's findings of fact

are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512–13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir.1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir.2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir.2006).

Judicial review of the ALJ's decision is direct, "but we play an 'extremely limited' role." *Simila v. Astrue*, 573 F.3d 503, 513–14 (7th Cir.2009). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir.1993). Just as " '[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps." *Masters v. Astrue*, 818 F.Supp.2d 1054, 1065 (N.D.Ill. 2011).

## C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir.1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir.2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.' " *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir.2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)(DIB); 20 C.F.R. § 416.905(a)(SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse*, 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir.2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2011, and that Plaintiff had not engaged in substantial gainful activity since November 18, 2005, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's tendonitis (overuse syndrome of upper extremities), status post carpal tunnel release of thumb, and depression were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 14–17.) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. at 23.) At step five, the ALJ found that Plaintiff could perform a limited range of light and sedentary work. (Tr. at 18–22.) The ALJ also found that Plaintiff was a younger individ-

ual (i.e., between the ages of 18 and 49) on the alleged disability onset date. (Tr. at 23.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 24.)

### E. Administrative Record

### 1. Physical Impairments

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated by John M. Markley, Jr., M.D., from 1991 through 2005 for carpal tunnel syndrome. (Tr. at 231–331.) Dr. Markley performed carpal tunnel release and deQuervain's release on Plaintiff in April of 1991 and 2001. (Tr. at 237, 295, 335.) As of 2002, Dr. Markley stated that Plaintiff could "continue with the current sedentary level light use job with the same ongoing restrictions." (Tr. at 256.) In November 2005, Dr. Markley noted that Plaintiff's "level of work restrictions have not changed and, in my estimation are permanent. She should be limited to sedentary light level use job restrictions." (Tr. at 261.) In November 2006, it was noted that Plaintiff had "been laid off for a year." (Tr. at 262.)

Dr. Hing noted that he "referred her to Dr. Chodoroff [but that] [h]is study of 11/30/06 did not show any objective evidence for compression in ... the bilateral median nerve at the wrist and the cubital tunnel at the wrist and elbow areas." (Tr. at 293.) Brian Chodoroff, M.D., confirmed that he "saw [Plaintiff] back in November of 2006 for an electrodiagnostic study, at which time the findings were normal." (Tr. at 300.) Dr. Chodoroff concluded that "[a]lthough she indicates excellent improvement following previously performed median nerve release surgery, I do not believe that a surgical procedure of that sort should be pursued at this time." (Tr. at 301.)

On December 7, 2006, an upper gastrointestinal exam showed "no hiatal her-nia or gastroesophageal reflux" and "compromise in the propulsion of barium through the esophagus, [but] otherwise no intrinsic or extrinsic abnormalities." (Tr. at 671.)

An MRI of the cervical spine taken on March 7, 2007, was "[n]ormal." (Tr. at 396, 668.)

Plaintiff was also treated by Wayne Smith, M.D., from 2006 through 2010 for her diabetes and hypertension. (Tr. at 363–401, 482, 605–74.)

In November 2007, David M. Hing, M.D., noted that Plaintiff had "not had any work since I saw her in December 2006," and that she "has been on restrictions to both hands to avoid high-torque vibratory air electric power tools, avoid repetitive power grasping and power pinch, and no lifting of more than two pounds." (Tr. at 264.) In June 2008, Dr. Hing indicated that although Plaintiff "is currently on restrictions of no lifting more than two pounds, I think that she could lift ten pounds on an occasional basis every fifteen minutes." (Tr. at 265, 297.)

Plaintiff was also treated by Allan Clague, M.D., in May and June of 2008. (Tr. at 332–40.) On June 4, 2008, Plaintiff was examined by Dr. Clague who diagnosed overuse syndrome, "recommended that she apply for Social Security Disability Benefits," and stated, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 335.)

On June 18, 2008, Plaintiff was examined and evaluated by Justin Riutta, M.D., who stated that Plaintiff's "clinical examination reveals no clear evidence of any findings that would be consistent with these diagnoses. She shows no significant amplification features, sensitivity throughout the upper extremities, sensory loss from the finger tips all the way to the elbow area,

and diffuse sensory loss does not conform to just the median nerve distribution." (Tr. at 330.) Therefore, Dr. Riutta recommended "that she return to work with her prior restrictions of no lifting greater than two pounds" and "[n]o assembly and no repetitive activities in the arm." (Tr. at 330.)

A Physical RFC Assessment completed by Saadat Abbasi, M.D., on September 23, 2009, concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8–hour workday, sit for about 6 hours in an 8–hour workday, and was unlimited in her ability to push or pull. (Tr. at 441.) There were no postural, manipulative, visual, communicative, or environmental limitations established except that handling should be limited and that she should avoid concentrated exposure to vibration. (Tr. at 442–44.) The assessment noted that there was a medical source statement on file that conflicted with the assessment findings in that Dr. Hing stated Plaintiff could lift 10 pounds on an occasional basis every 15 minutes. (Tr. at 446.)

On December 9, 2008, Dr. Clague examined Plaintiff and found that her "gait was normal," "[t]andem walking was good and her balance was good[,]" her lumbosacral spine was normal, there was some "limitation of motion" in the cervical spine, and an inspection of her "hands revealed hyperextension of the distal phalanx of the fingers"; Dr. Clague stated that these "findings suggest an anterior interosseous nerve syndrome." (Tr. at 468.) Dr. Clague noted that Plaintiff had applied for social security disability benefits and concluded by stating, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 469.) On June 18, 2009, March 16, 2010, and July 30, 2010, the findings were essentially the same. (Tr. at 480–81, 536–37, 541–42.)

On August 13, 2009, another Physical RFC Assessment was completed by Neal E. Bente, M.D. (Tr. at 527–32.) The assessment concluded that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk about 6 hours in an 8–hour workday, sit for about 6 hours in an 8–hour workday, and was unlimited in her ability to push or pull. (Tr. at 528.) The assessment also found that Plaintiff should never climb ladders, ropes or scaffolds, should only frequently climb ramps or stairs, balance, stoop, kneel, or crouch, and should only occasionally be required to crawl. (Tr. at 529.) Plaintiff was found to be limited as to manipulation, but was unlimited in the visual, communicative and environmental areas. (Tr. at 529–30.) It was noted that there was a medical source statement that conflicted with the treating neurologist who "limited sitting to less than an hour" because Plaintiff "said she could sit unlimited as long as she did not have to use the UE's.[2] The claimant's statement is given weight." (Tr. at 531 (footnote added).)

On May 12, 2010, Dr. Smith advised Plaintiff "to stop smoking" and when discussing ways to "keep her hands busy[,]" Plaintiff told Dr. Smith that "[s]he likes to do crossword puzzles." (Tr. at 609.)

On August 12, 2010, Dr. Clague completed a Physical Medical Source Statement wherein he concluded that Plaintiff was able to sit for 15 minutes at a time, stand for 30 minutes at a time, stand or walk for about 2 hours in an 8–hour workday, and sit for about 4 hours in an 8–hour workday, would need to take unscheduled breaks "at least 20x/day," could only rarely lift less than 10 pounds or perform any

---

**2.** UE stands for upper extremities.

twisting, stooping, etc., and could only use her hands, fingers, or arms "1 % or less" of the 8–hour workday. (Tr. at 552–53.) Dr. Clague stated that Plaintiff would be "offtask" 100% of the time, that she was incapable of even low-stress work, and that her impairments were likely to produce only bad days. (Tr. at 554.)

## 2. Mental Impairments

Plaintiff also sought treatment with Sharon K. Allen, M.S.W., C.S.W., in July 2008. (Tr. at 341.) On July 7, 2008, Allen diagnosed Plaintiff with "Major Depressive Disorder, 296.3x." (*Id.*) Allen noted that Plaintiff had been prescribed antidepressant medication by her primary care physician and that her depression seemed related to the "inability to perform her job as a line production worker for Ford." (*Id.*) Allen recommended that Plaintiff "be evaluated by a Psychiatrist for medication management." (*Id.*)

Plaintiff was also treated at the Herrick Outpatient Mental Health Center from 2008 through 2010. (Tr. at 343–45, 448–62, 564–604.) Plaintiff participated in therapy at the Herrick Outpatient Behavioral Health Center for several months in 2008. (Tr. at 449–62.) Improvements in symptom control, insight into problems, and coping skills were consistently noted.

On September 9, 2008, Plaintiff was examined, at the request of Disability Determination Services ("DDS"), by Harold Bilotta, Jr., M.S., with the approval of James P. Stewart, Ph.D. (Tr. at 416–22.) Bilotta noted that Plaintiff had "good sense of humor," "demonstrated adequate contact with reality," and was "extremely focused on herself and her symptoms." (Tr. at 419.) Bilotta diagnosed Depressive Disorder NOA, assessed a GAF score of 53, and gave a "[g]uarded" prognosis. (Tr. at 421.)

A Psychiatric Review Technique completed by John Gallagher, Ed.D., limited license psychologist, on September 24, 2008, diagnosed affective disorders, i.e. depressive disorder, NOS. (Tr. at 423, 426.) Plaintiff was found to have moderate limitations as to activities of daily living and in maintaining concentration, persistence or pace, and only mild limitations in maintaining social functioning. (Tr. at 433.) A Mental Residual Functional Capacity ("RFC") Assessment completed by Gallagher on September 24, 2008, concluded that there was no evidence that Plaintiff was limited at all as to her ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to carry out very short and simple instructions, and the ability to sustain an ordinary routine without special supervision. (Tr. at 437.) In addition, the assessment found that Plaintiff was not significantly limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions. (*Id.*) Plaintiff was found to be moderately limited in the ability to maintain concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 437–38.) Plaintiff was found to not be significantly limited in any areas of social interaction or adaptation. (Tr. at 438.) The assessment noted:

> Records show that the claimant was on Zoloft from at least 9/05 by Dr. Smith

but Dr. S does not give any dx[3] except to say that she is stressed. There is no other mention of psych concerns in his records from AOD to present. The MSW[4] puts the depression as occurring during the past year. There is no evidence that the depression was any worse prior to CE and eval by Herrick. It is only considered severe here as the combination of depression and pain appears to affect her concentration and daily functioning to some extent. She is still able to sustain simple routine tasks.

(Tr. at 439 (footnotes added).)

On August 13, 2010, Ross L. Thayer, M.S., L.L.P., limited license psychologist, completed a Mental Impairment Questionnaire. (Tr. at 543–48.) Thayer diagnosed anxiety disorder, NOS, and major depressive disorder, and assessed a GAF score of 55. (Tr. at 543.) After listing Plaintiff's symptoms, Thayer concluded that Plaintiff's mental abilities and aptitudes needed to do unskilled work were all "limited but satisfactory" or "seriously limited, but not precluded," except that Plaintiff was unable to meet competitive standards as to working in coordination or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, responding appropriately to changes in a routine work setting, dealing with normal work stress, and being aware of normal hazards and taking appropriate precautions. (Tr. at 544–45.)

With regard to Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods, Thayer found that Plaintiff's limitations fell in between the "seriously limited, but not precluded" and "unable to meet competitive standards" categories. (Tr. at 545.) Thayer found that Plaintiff was "limited but satisfactory" in her ability to understand and remember detailed instructions and her ability to maintain socially appropriate behavior, and was "unlimited or very good" in her ability to adhere to basic standards of neatness and cleanliness. (Tr. at 546.) Thayer also found that Plaintiff was "seriously limited, but not precluded" from carrying out detailed instructions, dealing with stress of semiskilled and skilled work, and interacting appropriately with the general public, and was in between the "limited but satisfactory" and "seriously limited, but not precluded" categories with respect to her ability to set realistic goals or make plans independently of others. (Id.)

Thayer also concluded that Plaintiff was "unable to meet competitive standards" as to traveling in unfamiliar places or using public transportation. (Id.) Thayer found either no restrictions or mild restrictions as to activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and marked difficulties in maintaining social functioning. (Tr. at 547.) He also found four or more episodes of decompensation within a twelve-month period, each of at least two weeks' duration because the "client reports ongoing, persistence episodic phases of depression and anxiety across entire past year." (Id.) Thayer found that Plaintiff had a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of her ability to do any basic work activity and an anxiety related disorder and complete inability to function independently outside the area of one's home.

---

**3.** "Dx" stands for diagnosis.

**4.** This is a reference to Sharon Allen, M.S.W. (Tr. at 341.)

(*Id.*) Thayer also concluded that Plaintiff's impairments would cause her to be absent more than four days per month. (Tr. at 548.)

### 3. Plaintiff's Report and Testimony

In her Daily Function Report, Plaintiff indicated that she is able to take care of her own personal care other than buttoning shirts, cook simple meals such as frozen dinners two or three times a week, move laundry in and out of the appliances, "mow [the] lawn about 1 hour every two weeks[,]" take the dog outside "5–6 times a day[,]" drive and ride in a car alone, shop in stores and by phone for groceries, clothes, or "anything [the] family needs" once or twice a week for thirty to forty minutes, watch television, listen to books on tape, sing in "praise bands" three times a week, socialize with family and friends every day, attend church three times a week for one and a half hours each time, take her son to and from school five days a week, visit her father at his home once a week, and handle her personal finances. (Tr. at 188–92.)

At the administrative hearing, Plaintiff testified that even when she is not using her hands, they "still hurt and they are still tingling . . . just sitting here they are just numb and swollen. . . ." (Tr. at 47.) Plaintiff also stated that although she can lift a gallon of milk off the shelf and put it in a grocery cart, she cannot carry a gallon of milk. (Tr. at 47–48.) Plaintiff also testified that her back hurts if she walks approximately the length of a football field because of the "scoliosis [she had] as a child" and that walking also "bothers . . . the screws I have in my left foot." (Tr. at 48.) Plaintiff indicated that she can stand for "maybe ten or 15 minutes" at a time. (Tr. at 49.) Plaintiff stated that she does not cook or open jars, and that she does not wear clothing with buttons because

they are too hard to maneuver. (*Id.*) Plaintiff further testified that she can sit for "a half-hour and 45 minutes" at a time and that she can drive for around "30 minutes without [her] . . . hands go[ing] numb holding the steering wheel. . . ." (Tr. at 51.) Plaintiff stated that she can use a computer for "about 20 or 25 minutes . . . and this is not a lot of typing . . . I mean, that's not constantly typing or clicking." (Tr. at 58–59.) Plaintiff also stated that she has migraines that can last "for days" and that when she has one, she stays at home in the "quiet." (Tr. at 56.)

### 4. Vocational testimony

The ALJ asked the vocational expert ("VE") to assume a person with Plaintiff's background who is

limited to lifting and carrying up to ten pounds occasionally and less than ten pounds frequently, could stand and/or walk about six hours a day, could sit about six hours daily, could push and pull without limits other than the ten and 20–pounds lifting and carrying limit. If this individual could only occasionally crawl, could frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds. Could frequently balance, stoop, kneel, crouch and crawl. And, if she could only occasionally work at or above the shoulder level and occasionally handle, finger, and feel. If the individual were limited to simple, routine tasks where she would be able to respond to supervisors and coworkers and the general public and adjust to changes.

(Tr. at 62.) The VE responded that such a person could not perform Plaintiff's past relevant work but could perform the unskilled, sedentary jobs of call-out operator (1,200 of which are available in the State of Michigan) and election clerk (1,100), as well as the unskilled light level jobs of counter clerk (7,000) and bus monitor

(3,700). (Tr. at 63.) The ALJ then asked the VE to assume all the same considerations except to reduce the lifting to no more than ten pounds and the VE indicated that the jobs described would not be affected. (Tr. at 63–64.) Next, the ALJ asked the VE to assume a person with Plaintiff's background who

> would need to be able to sit for 15 minutes at a time for a total of four hours a day. Could stand about 30 minutes at a time. Could walk one or two blocks at a time and could total stand and walk about two hours. They would need to be able to shift positions at will, from sitting, standing, and walking and would need to include periods of walking every 15 minutes for [INAUDIBLE] for approximately [INAUDIBLE].
>
> The individual would need to take unscheduled breaks three times a day lasting ten or 15 minutes at a time. Could rarely lift even less than ten pounds. Could less than occasionally or rarely twist, stoop, crouch, or climb stairs. Could never climb ladders. Can use their hands for handling, grasping, turning and twisting objects one percent or less of the time during the day. Could also finger, doing fine manipulation lasting one percent or less at the time during the day. Could also reach in front of the body one percent or less of the time. And, could do no overhead reaching. This person would likely be off-task 100 percent of the time, incapable of even low-stress jobs.

(Tr. at 64–65.) The VE testified that there would not be any jobs that such a person could perform. (Tr. at 65.) The ALJ then asked the VE to assume a person with Plaintiff's background who was unable to meet competitive demands in many areas after which the VE indicated that such a person would not be able to perform any jobs. (Tr. at 65–66.)

## F. Analysis and Conclusions

### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light and sedentary work. (Tr. at 18–22.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (1991). Social Security Ruling 83–10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday,

and sitting should generally total approximately 6 hours of an 8–hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83–10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the "ALJ failed to properly evaluate the opinions of the treating medical sources in accordance with the regulations and controlling case law, and the result was an opinion unsupported by substantial evidence." (Doc. 9 at 15–20.) In addition, Plaintiff argues that the "ALJ erred in failing to consider evidence of Plaintiff's frequent migraine headaches." (Doc. 9 at 20.)

### a. Treating Sources

Plaintiff argues that the ALJ improperly "rejected" the opinion of Plaintiff's treating neurologist, Dr. Clague, in favor of Dr. Bente, who was a non-examining physician.

(Doc. 9 at 15–16.) In addition, Plaintiff contends that the ALJ improperly rejected Plaintiff's treating limited license psychologist, Ross Thayer, in favor of "a one-time examining psychologist, Dr. Gallagher, and a case analysis by a Dr. Biscardi[.]" (Doc. 9 at 18.)

### i. Standards

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." S.S.R. 06–3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir.2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, ... her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.,* 652 F.3d 646, 651 (6th Cir.2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special signifi-

cance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F.Supp.2d 1054, 1067 (N.D.Ill.2011) (citation omitted). "Otherwise, the hearing would be a useless exercise." *Id.*

■■■■ "[A] treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she " 'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.' " *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight ... [but] 'is just one more piece of evidence for the administrative law judge to weigh....' " *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir.2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379–80 (6th Cir. 2013).

■■■■ If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. S.S.R. 06–3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions ..., [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 938 (6th Cir. 2011) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir.2009)).

■■■ A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." S.S.R. 06–03p, 2006 WL 2329939, at *1–2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v.*

*Comm'r of Soc. Sec.,* 461 Fed.Appx. 433, 439 (6th Cir.2012) (quoting *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir.2007)). " 'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.' " *Adams v. Massanari,* 55 Fed.Appx. 279, 284 (6th Cir.2003) (quoting *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987)).

 "Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir.2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96–2p, 1996 WL 374188, at *5 (1996). *See also Rogers,* 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole,* 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243.

### ii. Physical Impairments

Plaintiff contends that the ALJ improperly "rejected" the opinion of Plaintiff's treating neurologist, Dr. Clague, in favor of Dr. Bente, who was a non-examining physician. (Doc. 9 at 15–16.) I suggest that the ALJ properly considered and gave reasons for the weight given the medical source opinions and that his decision was supported by substantial evidence. (Tr. at 14–22.)

The ALJ thoroughly considered all of the medical opinions and evidence regarding physical impairments and decided

[t]o not give significant weight to Dr. Clague's assessment because the particulars of his assessment are not well supported by objective or other evidence. Further, the claimant has testified that there is no limitation on her ability to sit when she is not using her hands. I find the residual capacity by Dr. Bente to be more consistent with the evidence as a whole and I accord more significant weight to the assessment of Dr. Bente than to the residual functional capacity assessments of Dr. Clague.

(Tr. at 19–20.)

After noting that Plaintiff had applied for social security disability benefits, Dr. Clague stated, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 469.) However, on that same date, Dr. Clague found that Plaintiff's "gait was normal[,] . . . [t]andem walking was good and her balance was good[,]" lumbosacral spine was normal, there was some "limitation of motion" in the cervical spine, and Plaintiff's "hands revealed hyperextension of the distal phalanx of the fingers"; Clague stated that these "findings suggest an anterior interosseous nerve syndrome." (Tr. at 468.)

First, Dr. Clague's conclusion that Plaintiff will be forever unable to work is an opinion that is not entitled to any particular weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Comm'r,*

283 Fed.Appx. 336, 341 (6th Cir.2008); *Turner v. Commissioner of Social Sec.*, 381 Fed.Appx. 488, 492–93 (6th Cir.2010); 20 C.F.R. § 404.1527(d)(3). In addition, the ultimate determination of residual functional capacity is also reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(3). Dr. Clague may have been motivated in the same manner recognized by the courts as stemming from the treating physician's desire to help their patients obtain benefits. *See Masters, supra; Dixon, supra.* Or, perhaps, Dr. Clague was referring only to Plaintiff's ability to return to her prior job as an assembler, which she would not be able to do since that work would aggravate her overuse syndrome. Whatever the motivation, Dr. Clague's medical findings do not support his conclusions regarding Plaintiff's functional capacity.

I further suggest that the record is replete with "well-supported contradicting evidence" contrary to Dr. Clague's opinion such that his opinion is "'just one more piece of evidence for the administrative law judge to weigh....'" *Bauer*, 532 F.3d at 608 (quoting *Hofslien*, 439 F.3d at 377).[5] Dr. Markley indicated that Plaintiff could perform sedentary level light use jobs on a permanent basis. (Tr. at 256, 261.) In addition, Dr. Hing noted that he "referred her to Dr. Chodoroff [but that] [h]is study of 11/30/06 did not show any objective evidence for compression in ... the bilateral median nerve at the wrist and the cubital tunnel at the wrist and elbow areas." (Tr. at 293.) Dr. Chodoroff confirmed that he "saw [Plaintiff] back in November of 2006 for an electrodiagnostic study, at which time the findings were normal." (Tr. at 300.) An MRI of the cervical spine taken on March 7, 2007, was also "[n]ormal." (Tr. at 396, 668.) In addition, Dr. Hing noted that Plaintiff could perform work with restrictions to accommodate her impairments, i.e., avoiding vibrations, no repetitive grasping or power pinching, and minimal lifting. (Tr. at 264, 265, 297.)

I suggest that the ALJ correctly noted that Dr. Clague's opinion that Plaintiff could rarely lift less than ten pounds or perform any twisting, stooping, etc., and could only use her hands, fingers, or arms "1% or less" of the eight-hour workday is completely unsupported by Dr. Clague's own findings and the other medical evidence of record. (Tr. at 552–53.) In addition, Dr. Clague's findings that Plaintiff would be "off-task" 100% of the time and that she was incapable of even low stress work (Tr. at 554) is not only not completely inconsistent with the evidence of record but is outside of Dr. Clague's field of expertise and, thus, properly discounted by the ALJ. *See Johnson, supra.* I therefore suggest that the ALJ's decision not to give significant weight to Dr. Clague's opinion was supported by substantial evidence.

### iii. Mental Impairments

Plaintiff argues that the ALJ improperly rejected Plaintiff's treating limited license psychologist, Ross Thayer, in favor of "a one-time examining psychologist, Dr. Gallagher...." (Doc. 9 at 18.) The ALJ thoroughly considered the opinions of all the medical sources regarding mental impairments. (Tr. at 22.) I further suggest that the record contains "well-supported contradicting evidence" contrary to Thayer's opinion and that Thayer's opinion is internally inconsistent such that his opinion is "'just one more piece of evidence for the administrative law judge to weigh....'" *Bauer*, 532 F.3d at 608 (quot-

---

**5.** I note that the ALJ did not subject Dr. Clague's opinion to greater scrutiny than any other medical opinion and, thus, did not commit the error described in *Gayheart, supra.*

ing *Hofslien,* 439 F.3d at 377).[6]

As noted by the ALJ, "[c]ontact notes document ongoing stressful problems-in-living such as 'anxiety and depression related to disability from work, medical complaints, and financial pressure' but the contact notes do not corroborate the marked difficulties in maintaining social functioning, or the four or more incidents of decompensation within a twelve-month period, indicated by Mr. Thayer." (Tr. at 22 (citations omitted).) I suggest that this observation is an accurate description of the lack of evidence to support the findings by Thayer. In addition, although Thayer found either no restrictions or mild restrictions as to activities of daily living, he found that Plaintiff had experienced four or more episodes of decompensation within a twelve-month period, each of at least two weeks duration because the "client reports ongoing, persistence episodic phases of depression and anxiety across entire past year." (Tr. at 547.) I suggest that Thayer's findings are internally inconsistent because if one experienced these episodes of decompensation, it would more than mildly restrict their daily activities.

Moreover, there is no evidence to support Thayer's conclusion that Plaintiff was "seriously limited" from interacting appropriately with the general public. (Tr. at 546.) Instead, Plaintiff indicates that she is social with family and friends every day, attends church three times a week and participates in a praise band three times a week. (Tr. at 188–92.) In addition, as noted by Dr. Gallagher,

> [r]ecords show that the claimant was on Zoloft from at least 9/05 by Dr. Smith but Dr. S does not give any dx except to say that she is stressed. There is no other mention of psych concerns in his records from AOD to present. The

MSW puts the depression as occurring during the past year. There is no evidence that the depression was any worse prior to CE and eval by Herrick. It is only considered severe here as the combination of depression and pain appears to affect her concentration and daily functioning to some extent. She is still able to sustain simple routine tasks.

(Tr. at 439.) After the RFC, Plaintiff participated in therapy in addition to taking prescription medication. However, Plaintiff was never hospitalized for depression and instead received only modest treatment that is inconsistent with a finding of disability. *See Myatt v. Comm'r of Soc. Sec.,* 251 Fed.Appx. 332, 334–35 (6th Cir. 2007).

I therefore suggest that the ALJ's decision to give less than controlling weight to Thayer's opinion was supported by substantial evidence.

### b. Migraine Headaches

Plaintiff argues that the "ALJ erred in failing to consider evidence of Plaintiff's frequent migraine headaches" because she "did not discuss migraines in either the 'severe impairment' or RFC portions of her decision." (Doc. 9 at 20.)

In the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue,* 266 Fed.Appx. 451, 457 (6th Cir.2008) (quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs,* 880 F.2d at 862. The test is used to "screen out totally groundless claims."

6. I note that the ALJ did not subject Thayer's opinion to greater scrutiny than any other medical opinion and, thus, did not commit the error described in *Gayheart, supra.*

*Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).

Plaintiff's argument that the ALJ erred by not adding migraine headaches to the list of severe impairments fails because once step two is "cleared" by a finding that some severe impairment exists, then the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 Fed.Appx. at 457. "The fact that some of [Plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, I suggest that any alleged omission from the list of severe impairments does not undermine the ALJ's decision. As to the RFC analysis, the ALJ expressly stated that she considered "all of the claimant's impairments, including impairments that are not severe." (Tr. at 13.) I therefore suggest that the ALJ committed no error. *See Kornecky*, 167 Fed.Appx. at 508 ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision-makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. *REVIEW*

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any fur-

ther right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir.2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.*, 454 F.3d at 596–97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 19, 2013